COMMONWEALTH of Pennsylvania, Appellee

v.

**Barnswell JONES, Appellant.**

Superior Court of Pennsylvania.

Submitted Oct. 12, 2004.

Filed April 25, 2005.

John C. Carlson, Reading, for appellant.

Douglas J. Waltman, Asst. Dist. Atty., Reading, for Com., appellee.

Before: HUDOCK, GANTMAN, and BECK, JJ.

GANTMAN, J.

¶ 1 Appellant, Barnswell Jones, asks us to determine whether the suppression court erred when it denied his omnibus pretrial motion which, *inter alia,* sought to suppress all evidence obtained as a result

of an investigatory detention subsequent to a routine traffic stop on October 17, 2001. Appellant also challenges the sufficiency of the evidence to support his convictions for possession with intent to deliver a controlled substance ("PWID")[1] and conspiracy.[2] We hold the investigative detention of Appellant was lawful under the circumstances of this case. We also hold Appellant had no constitutional expectation of privacy in a rental automobile, where he was the operator of the vehicle but not the named lessee, he was not an authorized driver, and the return date on the rental agreement had passed. We further hold the Commonwealth's evidence was sufficient to support Appellant's convictions. Accordingly, we affirm.

¶ 2 The relevant facts and procedural history of this appeal are as follows. On October 17, 2001, at approximately 1:35 a.m., Officer Dale Ulshafer, a five year veteran of the Fleetwood Police Department, began to follow a teal Toyota Corolla traveling southbound on Route 222. Officer Ulshafer observed the vehicle cross over the double yellow centerline four times. After the fourth centerline cross over, Officer Ulshafer activated his overhead lights to effectuate a traffic stop. The Corolla pulled onto the shoulder of the road. In addition to the driver, a female sat in the front passenger's seat and a male sat in the rear of the vehicle on the passenger's side.

¶ 3 Officer Ulshafer exited his patrol car and asked Appellant (the driver) for his license, vehicle registration, and proof of insurance. Appellant provided a non-driver identification card from New York. The card contained the name "William Graham." Additionally, Appellant did not produce registration and insurance papers. Instead, Appellant gave Officer Ulshafer a rental agreement from Enterprise Rent-a-Car Company ("Enterprise"). Officer Ulshafer returned to his patrol car to review the documents.

¶ 4 Officer Ulshafer called for back-up and ran a PennDOT computer check on the information from Appellant's identification card. This check could not verify the information on the card. Officers Phillips, Wood, and Soumas arrived shortly thereafter. With his back-up in place, Officer Ulshafer returned to the Corolla and asked to speak with each passenger individually. During Appellant's interview, he stated the group had been in New York for a few hours and that he was returning to his home in Reading. Appellant denied drinking alcohol, but admitted he was extremely tired. Appellant indicated that the passenger in the front, Melissa Nieves, was his girlfriend and the passenger in the rear, Jamal Walker, was his cousin.

¶ 5 Nieves declared she was Appellant's girlfriend, and called him "Will" throughout her interview. She said the group had been in New York "for a while" visiting friends and family. She also identified Walker as Appellant's friend, but she did not know anything else about him. Walker told Officer Ulshafer that the group had been in New York for one week. Walker also said Appellant was his cousin, and he referred to Appellant as "Wes." Additionally, Walker produced a valid New York driver's license.

¶ 6 During Officer Ulshafer's interviews with Nieves and Walker, Officer Wood engaged Appellant in conversation. Officer Wood questioned Appellant about his identification card, but Appellant seemed preoccupied. Officer Wood later testified:

[Appellant] really wasn't paying attention to me when I was talking to him,

1. 35 P.S. § 780–113(a)(30).

2. 18 Pa.C.S.A. § 903(a)(1).

when I was asking him questions. He was focusing on the right front of the vehicle. And I noticed when the other officers would bring the occupants out, he was concentrating on the right front of the vehicle, specifically the female passenger.

(N.T. Trial, 3/23/04, at 69).

¶ 7 After the interviews, Officer Ulshafer returned the rental agreement to Appellant and told him that the group was free to leave if Walker drove. However, based upon the inconsistent statements from the passengers and his drug interdiction training, Officer Ulshafer believed the group was trafficking narcotics. Before the group left, Officer Ulshafer resumed conversation with Appellant and asked for consent to search the automobile. Officer Ulshafer also asked Appellant if he could see the car rental agreement again. Appellant appeared nervous and stalled before refusing to consent to a search. Officer Ulshafer advised Appellant that he would call for a drug dog to come to the scene to sniff the vehicle for narcotics. Appellant consented to a drug sniff.

¶ 8 While Officer Ulshafer located the drug dog, his fellow officers examined the agreement and discovered the Corolla had been rented from a location in Reading. Moreover, the Corolla's return date had expired. The named lessee, Shawna Norris, was not in the vehicle, and the agreement expressly prohibited anyone other than Norris from driving the vehicle. Further, the agreement did not permit the car to be driven outside of Pennsylvania. In light of this new information, Officer Ulshafer called Enterprise and advised one of their representatives of his findings. The representative asked the police to have the vehicle towed from the scene and impounded.

¶ 9 Officer Ulshafer informed the passengers about this development and of-

fered them courtesy transportation to the nearest gas station with a pay phone. The passengers exited the Corolla and the officers patted them down prior to the courtesy ride. Officer Ulshafer placed the passengers in his patrol car, drove them a short distance down Route 222, and released them at the gas station. Meanwhile, Officers Wood and Phillips remained with the Corolla and waited for the tow truck. Officer Wood testified about his observations of the automobile:

I walked up to the right front passenger area and shined my flashlight through the passenger-side window, into the windshield, and I noticed suspected narcotics on the right front passenger seat, between the floor and the door, like the floorboard area where the seat controls are.

\* \* \*

They were in a—not a clear bag, but a grocery-type bag.

\* \* \*

The bag was—the contents were in the bag, and the bag was sitting, you know, in the door, and you could see what was in the bag. The handles were up, you know, like—I lifted it with a pen. That's how I pulled it out.

(*Id.* at 71, 73, 74). The windows and doors of the Corolla were shut, but the car was not locked. Officer Wood opened the passenger-side door, examined the items in the grocery bag, seized the grocery bag and its contents, and placed these items in his patrol car.

¶ 10 With the suspected narcotics secured, Officer Wood radioed Officer Ulshafer and told him not to release the suspects. However, Officer Ulshafer did not get this call until approximately two minutes after he had left the suspects at the gas station. Officer Ulshafer returned to the gas station, and Officers Wood and

Phillips went to assist him. Officer Wood found Appellant and Nieves in the women's bathroom. Shortly thereafter, Officer Ulshafer found Walker hiding under the gas station dumpster.

¶ 11 While in custody, police searched Appellant incident to arrest. The search yielded $481.00 in cash, in denominations of five, ten, twenty, and fifty dollar bills. Further, laboratory tests revealed that the grocery bag taken from the Corolla contained two packages of cocaine; one package of "crack" cocaine weighing 101 grams and one package of "powder" cocaine which weighing 55.8 grams. Police subsequently charged Appellant with false identification to law enforcement authorities,[3] PWID, conspiracy, drivers required to be licensed,[4] and driving on roadways laned for traffic.[5]

¶ 12 Officers Ulshafer and Wood testified at Appellant's preliminary hearing on November 20, 2001. Following this hearing, the court determined that the Commonwealth had established a *prima facie* case against Appellant and bound over the charges for trial. On February 21, 2002, Appellant filed an omnibus pretrial motion

which, *inter alia,* sought to suppress all evidence obtained as a result of the traffic stop, on the grounds that Officer Ulshafer did not possess "specific and articulable facts" that criminal activity might have been afoot, pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The suppression court conducted a hearing on April 10, 2002, and denied Appellant's motion on May 22, 2002.[6] After several continuances, Appellant's jury trial commenced on March 23, 2004.[7]

¶ 13 At trial, the Commonwealth presented three witnesses. Officers Ulshafer and Wood both testified about their involvement in the events leading to Appellant's arrest. Additionally, Corporal Scott Errington, from Berks County, testified as an expert in the field of illegal narcotics. Corporal Errington opined that the cocaine seized from the rental car was possessed with the intent to distribute. Corporal Errington based this opinion on the amount of cocaine seized, its packaging, the lack of drug paraphernalia for consumption, and the amount of cash carried by Appellant. Following the Common-

---

3. 18 Pa.C.S.A. § 4914.

4. 75 Pa.C.S.A. § 1501.

5. 75 Pa.C.S.A. § 3309.

6. The parties stipulated that the record for the suppression hearing would consist of the transcript from Appellant's November 20, 2001 preliminary hearing. (Suppression Court Opinion, filed May 23, 2002, at 1). The preliminary hearing transcript, however, does not support the suppression court's the sequence of events as described in findings of fact # 12 and # 13. (*Id.* at 2). Specifically, the sequence of events set forth in the suppression court's finding of fact # 12 is inconsistent with the preliminary hearing testimony. The court's findings suggest Officer Ulshafer told Appellant that he and his passengers were free to leave **before** Officer Ulshafer interviewed the passengers outside of

the vehicle. (*Id.* at 2). Instead, the preliminary hearing transcript makes clear that Appellant and his passengers were told they were free to leave **after** Officer Ulshafer interviewed the passengers outside of the vehicle. (N.T. Preliminary Hearing, 11/20/01, at 8–9). Consistent with the affidavit of probable cause, the preliminary hearing testimony, and the suppression court's ultimate decision to deny Appellant's motion, we conclude finding of fact # 12 misstates the sequence of events. Accordingly, our analysis relies on the sequence of facts as testified to at the preliminary hearing; namely, that Officer Ulshafer told Appellant he and his passengers were free to leave **after** Officer Ulshafer interviewed the passengers outside of the vehicle.

7. The certified record reveals Appellant waived his rights under Pennsylvania Rule of Criminal Procedure 600.

wealth's case-in-chief, the defense did not present any witnesses. Moreover, the trial court conducted an on-the-record colloquy, at which time Appellant announced his decision not to testify on his own behalf.

¶ 14 After brief deliberations, the jury found Appellant guilty of false identification to law enforcement authorities, PWID, and conspiracy. The trial court also found Appellant guilty of the summary offenses of drivers required to be licensed and driving on roadways laned for traffic. Sentencing occurred on April 22, 2004. On his conviction for possession with intent to distribute, the court sentenced Appellant to five to ten years' imprisonment, plus fines and costs totaling $25,000.00. On his conviction for conspiracy, the court sentenced Appellant to a concurrent sentence of three and one-half to seven years' imprisonment, plus $50.00 in fines and costs. For the false identification offense, the court sentenced Appellant to one year of probation, consecutive to the drug possession sentence. The court also ordered Appellant to pay a $200.00 fine for the licensing offense and a $25.00 fine for the driving offense. This timely appeal followed.

¶ 15 Appellant now raises the following two issues for our review:

DID THE COURT ERR IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE?

WAS THE VERDICT BASED ON INSUFFICIENT EVIDENCE TO ENABLE THE FACT FINDER TO FIND EVERY ELEMENT OF THE CRIMES BEYOND A REASONABLE DOUBT, AND THE EVIDENCE INTRODUCED BY THE COMMONWEALTH AS TO APPELLANT'S POSSESSION WITH INTENT TO DELIVER SO WEAK AND INCONCLUSIVE THAT AS A MATTER OF

LAW NO PROBABILITY OF FACT COULD BE DRAWN FROM THE COMBINED CIRCUMSTANCES?

(Appellant's Brief at 6).

¶ 16 "Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. LaMonte*, 859 A.2d 495, 499 (Pa.Super.2004) (quoting *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003), *cert. denied*, 540 U.S. 1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2004)). Our scope of review is limited:

[W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Grundza*, 819 A.2d 66, 67 (Pa.Super.2003), *appeal denied*, 574 Pa. 764, 832 A.2d 435 (2003) (quoting *Commonwealth v. Reppert*, 814 A.2d 1196, 1200 (Pa.Super.2002) (*en banc*)).

¶ 17 In his first issue, Appellant does not challenge the initial stop of the automobile. Appellant asserts this stop ended when Officer Ulshafer told Appellant and his cohorts they were free to leave if they switched drivers. Nevertheless, Appellant contends he was subjected to an illegal second investigative detention when Officer Ulshafer asked for consent to search the automobile. Appellant also maintains the police searched the Corolla without a warrant, after Appellant and his cohorts had departed. Appellant concludes the police lacked reasonable suspicion of criminal

activity to support the second investigative detention, their warrantless search of the automobile violated his rights under the United States and Pennsylvania Constitutions, and the court erred when it denied his motion to suppress the drugs. We disagree.

¶ 18 " 'Interaction' between citizens and police officers, under search and seizure law, is varied and requires different levels of justification depending upon the nature of the interaction and whether or not the citizen is detained." *Commonwealth v. DeHart*, 745 A.2d 633, 636 (Pa.Super.2000). The three levels of interaction are mere encounter, investigative detention, and custodial detention. *Id.*

> A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.
>
> In contrast, an investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity. In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

*Id.* (internal citations and quotation marks omitted).

¶ 19 "To determine if an interaction rises to the level of an investigative detention, *i.e.,* a *Terry* stop, the court must examine all the circumstances and determine whether police action would have made a reasonable person believe he was not free to go and was subject to the officer's orders." *Commonwealth v. Stevenson*, 832 A.2d 1123, 1127 (Pa.Super.2003).

> An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates the protections of Article 1, Section 8 of the Pennsylvania Constitution. To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot. Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.

*Id.* (internal citations omitted). "Accordingly, where the purpose of an initial traffic stop has ended and a reasonable person would not have believed that he was free to leave, the law characterizes a subsequent round of questioning by the police as an investigative detention or arrest." *Commonwealth v. Johnson*, 833 A.2d 755, 762 (Pa.Super.2003), *appeal denied,* 577 Pa. 712, 847 A.2d 1280 (2004).

> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate.

*Id.* at 763 (internal citations and quotation marks omitted).

¶ 20 Where the investigative detention at issue follows a lawful traffic stop, the officer must demonstrate cause for suspicion after the end of the initial stop, and independent of any basis on which he conducted the prior stop. *Id. See also Commonwealth v. Freeman,* 563 Pa. 82, 757 A.2d 903 (2000) (holding investigative detention following lawful traffic stop must be justified by articulable reasonable suspicion of criminal activity independent of that supporting initial stop); *Commonwealth v. Ortiz,* 786 A.2d 261 (Pa.Super.2001), *appeal denied,* 568 Pa. 717, 797 A.2d 912 (2002) (holding same). "[A] combination of factors, none of which taken alone would justify a stop, may be sufficient to achieve a reasonable suspicion." *Commonwealth v. Riley,* 715 A.2d 1131, 1135 (Pa.Super.1998), *appeal denied,* 558 Pa. 617, 737 A.2d 741 (1999).

¶ 21 Instantly, Appellant does not challenge the initial traffic stop. During the initial stop, Appellant provided Officer Ulshafer with a non-driver identification card from New York and an Enterprise car rental agreement. A computer check could not verify the information on Appellant's identification card, and Officer Ulshafer asked to speak with each passenger individually. The passengers provided inconsistent statements about various details concerning their out-of-state trip. Based upon the inconsistent statements from the passengers and his drug interdiction training, Officer Ulshafer believed the group was trafficking narcotics. However, Officer Ulshafer decided to release the group on the condition that Walker drove. Thus, the first citizen/police interaction ended when Officer Ulshafer returned the identification card and rental agreement to Appellant and informed him that he was free to leave.

¶ 22 A second investigative detention ensued when Officer Ulshafer asked for consent to search the automobile, thereby prohibiting Appellant from leaving. *See Johnson, supra* (stating traffic stop concluded when trooper returned driving documents, issued citation, and told driver he was free to leave; but subsequent investigative detention began when trooper's questioning prohibited driver from leaving). Appellant appeared nervous and stalled before answering. This behavior raised Officer Ulshafer's suspicions. Eventually, Appellant refused to consent to a search; however, he did consent to a drug dog sniff of the automobile. Under the totality of these circumstances, including Appellant's nervousness and stalling, combined with the group's prior inconsistent statements, the unverifiable information on Appellant's identification card, and Officer Ulshafer's experience and drug interdiction training, we conclude Officer Ulshafer had specific and articulable facts to substantiate a reasonable suspicion of criminal activity. *See Riley, supra. See also Johnson, supra* at 764–765 (holding combination of observations made by trooper during routine traffic stop and subsequent investigative detention, including driver's nervous appearance and inconsistent statements, provided reasonable basis for investigative detention).

¶ 23 With respect to Appellant's challenge to the warrantless police search of the rental car following the second investigative detention, we note generally under Pennsylvania law, a defendant charged with a possessory offense has automatic standing to challenge a search. *Commonwealth v. Perea,* 791 A.2d 427 (Pa.Super.2002), *appeal denied,* 568 Pa. 736, 798 A.2d 1288 (2002); *Commonwealth v. Strickland,* 707 A.2d 531 (Pa.Super.1998), *appeal denied,* 556 Pa. 675, 727 A.2d 130 (1998). "However, in order to prevail, the defendant, as a preliminary

matter, must show that he had a privacy interest in the area searched." *Perea, supra* at 429 (citing *Commonwealth v. Sell,* 504 Pa. 46, 470 A.2d 457 (1983)).

An expectation of privacy is present when the individual, by his conduct, exhibits an actual (subjective) expectation of privacy and that the subjective expectation is one that society is prepared to recognize as reasonable. The constitutional legitimacy of an expectation of privacy is not dependent on the subjective intent of the individual asserting the right but on whether the expectation is reasonable in light of all the surrounding circumstances.

*Commonwealth v. Brundidge,* 533 Pa. 167, 173, 620 A.2d 1115, 1118 (1993) (internal citations and quotation marks omitted).

¶ 24 Pennsylvania law makes clear there is no legally cognizable expectation of privacy in a stolen automobile. *Strickland, supra* at 534. Additionally, this Court has declined to extend an expectation of privacy to an "abandoned" automobile. *Perea, supra* at 429. However, the instant case presents a scenario not addressed by our courts: whether the operator of a rental car has standing to challenge the constitutionality of the vehicle search, when he is not an authorized driver and the automobile rental agreement has expired.

¶ 25 Several other jurisdictions, dealing with factually similar cases, have declined to extend an expectation of privacy to the rented automobile. *State v. Hill,* 322 Mont. 165, 94 P.3d 752 (2004); *Hall v. State,* 223 Ga.App. 211, 477 S.E.2d 364 (1996); *Colin v. State,* 101 Md.App. 395, 646 A.2d 1095 (1994), *cert. denied,* 337 Md. 42, 650 A.2d 725 (1994). In *Hill,* a highway patrol officer stopped the defendant to issue him a speeding citation. The defendant handed over his driver's license and stated that the automobile was rented, but failed to produce a copy of the rental agreement. After running a computer check on the car's license and registration numbers, the officer confirmed that the car was registered to a rental company and had not been reported as stolen. The officer proceeded to write the defendant's citation. The officer gave the defendant this citation, explained the options for contesting the citation, and said "we're done."

¶ 26 However, the officer noticed the defendant did not have any luggage in the automobile. This prompted the officer to engage the defendant in conversation about his point of origin and destination. The defendant claimed to be driving from Tacoma to Missoula, but only for a one-night stay at a friend's house. The officer asked the defendant if he was carrying anything illegal in the car and the defendant said "no." The officer requested permission to search the car and defendant initially agreed. The officer went to his patrol car to obtain a consent form, and by the time he returned to the defendant's vehicle, the defendant had changed his mind about consenting.

¶ 27 At that time, the defendant complained that a "friend" had rented the car and he could not be sure about what she had put into the trunk. The defendant decided to let the officer search the cabin of the automobile, but not the trunk. Aside from a cell phone and DVD player, the cabin did not contain any contraband. The officer asked the defendant once more about the automobile's point of origin. The defendant reaffirmed that a friend, whose name he did not know, had rented it. The officer returned to his patrol car to check on the origin of the rental car and learned the car had been rented from an Avis office in Spokane. The officer contacted Avis for additional information. He learned that the car was two days overdue and the defendant was not an authorized

driver. The Avis representative asked the officer to impound the car and also consented to a search of the vehicle.

¶28 After back-up arrived, the officer placed the defendant in the back of his patrol car and held him on suspicion of unauthorized use of a vehicle. The officer opened the trunk of the rental car and found two duffel bags. The defendant denied owning these bags. One bag contained shoes, clothes, a shaving kit, and a cell phone charger matching the defendant's cell phone. The other bag contained six and one-half pounds of marijuana and one-half pound of hashish. Police charged the defendant with possession of dangerous drugs with intent to distribute. Prior to trial, the defendant filed a motion to suppress the evidence obtained from the automobile, which was denied. The defendant was subsequently convicted and sentenced to five years' imprisonment.

¶29 On appeal, the Montana Supreme Court assessed the defendant's actual expectation of privacy and the reasonableness of this expectation:

> Considering [the defendant's] status as an unauthorized driver, combined with his failure to demonstrate any relationship with the authorized user, it is doubtful that he had an actual or subjective expectation of privacy in the vehicle's trunk and its contents.
>
> * * *
>
> [The defendant], because he was an unauthorized driver, lacked the right to exclude others from the trunk of the car, suggesting a corresponding lack of a subjective expectation of privacy therein. However, assuming, *arguendo*, that [the defendant] did have a subjective expectation, we conclude that the expectation was not objectively reasonable.
>
> * * *
>
> Like the defendant in [State v.] McCarthy, [258 Mont. 51, 852 P.2d 111 (Mont.

1993), the defendant] did not own the vehicle. Further, [the defendant] had not rented the car, and he had no permission to use the car. The car was two days overdue to Avis. [The defendant] failed to establish any relationship whatsoever to the last authorized renter of the car. And importantly, [the defendant] voluntarily relinquished any interest in the vehicle's trunk and its contents.

> * * *
>
> [The defendant] voluntarily relinquished any control he exercised over the contents of the trunk by twice overtly denying knowledge or ownership of anything there and once implicitly doing so.
>
> * * *
>
> [W]e find [the defendant] had no reasonable expectation of privacy in the vehicle and its contents. Therefore, there was no unlawful government intrusion into [the defendant's] privacy.

*Hill, supra* at 172–176, 94 P.3d at 757–59. *See also Hall, supra* (stating unauthorized driver of rental car lacked standing to challenge search after car was impounded); *Colin, supra* (holding defendant did not have standing to challenge constitutionality of vehicle search where defendant was not named in rental agreement, agreement prohibited persons other than lessee from driving, and defendant did not make arrangement with owner to drive). Following our own careful review of the relevant facts and case law, we agree with the analysis of the Montana Supreme Court in *Hill.*

¶30 Instantly, Officer Ulshafer effectuated a routine traffic stop of Appellant's automobile. Appellant does not challenge the validity of this stop. Officer Ulshafer approached Appellant and requested a driver's license and registration and insurance information. Appellant gave Officer

Ulshafer a non-driver identification card from New York. The information on this card could not be verified through a computer check. Further, Appellant gave Officer Ulshafer a rental agreement from Enterprise. An inspection of this agreement revealed that the return date had expired, Appellant was not the named lessee, the named lessee was not in the automobile, and Appellant was not authorized to drive the automobile.

¶ 31 Appellant and his passengers did not attempt to explain their connection to the authorized lessee of the automobile. Moreover, the passengers made inconsistent statements about various details concerning their out-of-state trip, which prompted Officer Ulshafer to ask Appellant for consent to search the vehicle. On these facts, Appellant cannot claim a reasonable expectation of privacy in the automobile. Further, Appellant's subjective expectation of privacy was not reasonable where he was the operator of a rental car but not the named lessee, was not an authorized driver, the named lessee was not present in the vehicle, Appellant offered no explanation of his connection to the named lessee, and the return date for the rental car had passed. *See Brundidge, supra.* Under these circumstances, we conclude the trial court properly denied Appellant's motion to suppress. *See La-Monte, supra; Grundza, supra.*

¶ 32 In his second issue, Appellant asserts that his passenger, Ms. Nieves, brought the cocaine into the automobile without his knowledge or consent. Appellant admits Nieves was his girlfriend, but he contends this fact alone cannot support the trial court's conclusion that Appellant constructively possessed the cocaine. Ap-

pellant avers the police found the cocaine in a part of the automobile "not peculiarly under [his] control." (Appellant's Brief at 12). Additionally, Appellant complains the money found on his person does not necessarily lead to the trial court's conclusion that he is a drug dealer, as there are many legitimate reasons to carry large amounts of cash. "[F]or the very same reasons," Appellant maintains he did not participate in a drug distribution conspiracy with Ms. Nieves. (*Id.*) Appellant concludes this Court must overturn his drug possession and conspiracy convictions.[8] We disagree.

¶ 33 When examining a challenge to the sufficiency of evidence, our standard of review is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the

8. Appellant does not challenge his convictions for false identification to law enforcement authorities, drivers required to be licensed, and driving on roadways laned for traffic; he con-

tests only the propriety of his convictions for possession with intent to deliver a controlled substance and conspiracy.

entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Bullick*, 830 A.2d 998, 1000 (Pa.Super.2003) (quoting *Commonwealth v. Gooding*, 818 A.2d 546, 549 (Pa.Super.2003), *appeal denied*, 575 Pa. 691, 835 A.2d 709 (2003) (citations omitted)).

¶ 34 "When contraband is not found on the defendant's person, the Commonwealth must establish constructive possession...." *Commonwealth v. Haskins*, 450 Pa.Super. 540, 677 A.2d 328, 330 (1996), *appeal denied*, 547 Pa. 751, 692 A.2d 563 (1997). "Constructive possession is the ability to exercise conscious control or dominion over the illegal substance and the intent to exercise that control." *Commonwealth v. Kirkland*, 831 A.2d 607, 610 (Pa.Super.2003), *appeal denied*, 577 Pa. 712, 847 A.2d 1280 (2004) (citing *Commonwealth v. Macolino*, 503 Pa. 201, 469 A.2d 132 (1983)). "[T]wo actors may have joint control and equal access and thus both may constructively possess the contraband." *Haskins, supra* at 330. "The intent to exercise conscious dominion can be inferred from the totality of the circumstances." *Kirkland, supra* at 610.

¶ 35 "To establish the offense of possession of a controlled substance with intent to deliver, the Commonwealth must prove beyond a reasonable doubt that the defendant possessed a controlled substance with the intent to deliver it." *Kirkland, supra* at 611 (citing *Commonwealth v. Conaway*, 791 A.2d 359 (Pa.Super.2002); *Commonwealth v. Aguado*, 760 A.2d 1181 (Pa.Super.2000)).

The trier of fact may infer that the defendant intended to deliver a controlled substance from an examination of the facts and circumstances surrounding the case. Factors to consider in determining whether the drugs were possessed with the intent to deliver include the particular method of packaging, the form of the drug, and the behavior of the defendant.

*Kirkland, supra* at 611. "Thus, possession with intent to deliver can be inferred from the quantity of the drugs possessed and other surrounding circumstances, such as lack of paraphernalia for consumption." *Commonwealth v. Torres*, 421 Pa.Super. 233, 617 A.2d 812, 814 (1992), *appeal denied*, 535 Pa. 618, 629 A.2d 1379 (1993).

¶ 36 To sustain a conviction for criminal conspiracy:

[T]he Commonwealth must establish that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and (3) an overt act was done in furtherance of the conspiracy.

*Commonwealth v. Murphy*, 795 A.2d 1025 (Pa.Super.2002), *aff'd*, 577 Pa. 275, 844 A.2d 1228 (2004). Circumstantial evidence may provide proof of the conspiracy. *Commonwealth v. Davalos*, 779 A.2d 1190 (Pa.Super.2001), *appeal denied*, 567 Pa. 756, 790 A.2d 1013 (2001). "The conduct of the parties and the circumstances surrounding such conduct may create a 'web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt." *Commonwealth v. Morton*, 355 Pa.Super. 183, 512 A.2d 1273, 1275 (1986), *appeal denied*, 514 Pa. 624, 522 A.2d 49 (1987). Additionally:

An agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and

conduct of the parties surrounding the criminal episode. These factors may coalesce to establish a conspiratorial agreement beyond a reasonable doubt where one factor alone might fail.

*Commonwealth v. Greene,* 702 A.2d 547, 554 (Pa.Super.1997).

 ¶ 37 Instantly, the police seized the drugs from the rental car, not from the persons of Appellant, Nieves, or Walker. The police found the cocaine in the cabin of the car, in plain view, shortly after the passengers had exited. Officer Wood testified that while standing with Appellant outside of the rental car, he saw Appellant constantly staring in the direction of the passenger seat that Nieves had vacated. Significantly, Officer Wood later discovered the cocaine in the same area. Further, Appellant had $481.00 in small denominations, which is common for someone involved in a drug distribution scheme. (N.T. Trial, 3/23/04, at 90). From the totality of these circumstances, we conclude the evidence was sufficient to establish that Appellant exercised conscious control or dominion over the cocaine, with the intent to exercise that control. *See Kirkland, supra; Haskins, supra.*

¶ 38 The Commonwealth also presented evidence in the form of Corporal Errington's expert testimony to establish that the drugs found in the rental car were intended for distribution. Corporal Errington testified, in relevant part, as follows:

It's my opinion that both those packages of cocaine were possessed with the intent to deliver or distribute.

\* \* \*

[F]irst and foremost, the weight of the cocaine and the way it's packaged. It's—it's a fairly large amount of cocaine, which wouldn't be consistent with someone who possessed it for personal use. Additionally, the way it's packaged, it's packaged in large quantities.

Normally, when a user possesses cocaine, they possess smaller amounts, smaller bags that they buy individually—

\* \* \*

It is—in fact, in my experience, I've never seen anyone who purchased cocaine for personal use, possess that quantity. Ordinarily, that's possessed with the intention to break down into smaller quantities, package it in smaller bags, and then redistribute it.

Also, the fact there was no—from my understanding, there was no items of drug paraphernalia seized, which, powder cocaine, you don't necessarily need any special paraphernalia to use it; but crack cocaine, someone who uses crack cocaine would have ordinarily a crack pipe to smoke it with. You have to have something to smoke it with.

(N.T. Trial, 3/23/04 at 86–89). Additionally, Corporal Errington testified that the quantity of cash seized from Appellant is common for a person involved in a drug distribution scheme. (*Id.* at 90). Based on the applicable case law and standard of review, this testimony amply supports Appellant's conviction for possession of cocaine with intent to deliver. *See Kirkland, supra; Bullick, supra; Torres, supra.*

 ¶ 39 Finally, regarding Appellant's conviction for conspiracy, the evidence established a close relationship between Appellant and his passengers; Appellant and Nieves both indicated Nieves was Appellant's girlfriend and Appellant and Walker both said they were cousins. All three passengers were present at the scene. Police discovered the cocaine in an area where any one of the passengers could have seen it and exercised control over it. The passengers also made inconsistent statements regarding the duration and purpose of their trip. Thus, the coales-

cence of this circumstantial evidence sufficiently established a conspiratorial agreement. *See Bullick, supra; Greene, supra.*

¶ 40 Based upon the foregoing, we hold the investigative detention of Appellant in the instant case was lawful, and Appellant had no constitutional expectation of privacy in the rental automobile, where he was the operator but not the named lessee of the vehicle, he was not an authorized driver, and the return date for the rental had passed. We further hold the Commonwealth's evidence was sufficient to support Appellant's drug and conspiracy convictions. Accordingly, we affirm Appellant's judgment of sentence.

¶ 41 Judgment of sentence affirmed.